# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 19-2805

ANTHONY HUERTA, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 20, 2020                                    Decided April 27, 2021)

*Scott W. MacKay*, of Port St. Lucie, Florida, for the appellant.

*Nicholas R. Esterman*, with whom *James M. Byrne*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Anna Whited*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before PIETSCH, ALLEN, and TOTH, *Judges*.

PIETSCH, *Judge*, filed the opinion of the Court. TOTH, *Judge*, filed a dissenting opinion.

PIETSCH, *Judge*: Diagnostic Code (DC) 5000 compensates for osteomyelitis, an infection of the bone. 38 C.F.R. § 4.71a (2020). That provision contains five discrete disability ratings—10%, 20%, 30%, 60%, and 100%. The question here is whether DC 5000 requires evidence of an active infection for a 100% rating. Army veteran Anthony Huerta argues that for a 100% disability rating the plain language of DC 5000 requires no more than a diagnosis of chronic osteomyelitis of the pelvis. Under this rationale, he seeks an increased rating retroactive to November 8, 1986. The Secretary contends that DC 5000 employs a "graduated" scheme, requiring an active infection process for a 100% rating. Because the Court finds DC 5000 is not ambiguous and its plain language warrants a 100% disability rating where there is a diagnosis of chronic osteomyelitis of the pelvis, the Court reverses the March 18, 2019, decision of the Board of Veterans' Appeals (Board).

## I. BACKGROUND

Mr. Huerta served in the U.S. Army from November 1983 to November 1986 and from June 1994 to July 1995. After a car accident at Fort Polk, Louisiana, he underwent emergency

surgery in August 1985 that included a spine stabilization with wiring and a spinal fusion with a bone graft from his left pelvis. A year later, Mr. Huerta discovered that he had unresolved osteomyelitis at the site of the pelvic bone graft. Record (R.) at 1756. A course of antibiotics resolved his symptoms "until 1989," when the site of the pelvic bone graft "swelled up and eventually broke open." *Id.* The wound was closed using a "muscle flap" surgery, which involves "transporting healthy, live tissue from one location of the body to another."[1] The muscle flap surgery revealed that the veteran had a "[c]hronic sinus tract from iliac bone graft." R. at 1338.

In 1991, the site of the pelvic bone graft again became infected and Mr. Huerta was placed on antibiotics. R. at 1759. Symptoms persisted for 3 months, and in January 1992, the infected area was incised and drained and Mr. Huerta was given more antibiotics. *Id.* An x-ray taken the same month revealed osteomyelitis of the left sacroiliac joint. R. at 1479.

About 2 years later, in December 1993, the bone graft site became discolored, painful, and swollen. R. at 1750. By the time he sought treatment the following month, the infection site was discharging. *Id.* After another incision and drainage, the veteran was once more prescribed a course of antibiotics. *Id.* By February 1994, the site was no longer draining or exhibiting other symptoms, and the veteran had no "fever, chills, sweats or weight loss." R. at 1757. Nonetheless, two private physicians, who were treating Mr. Huerta's pelvic condition in tandem, expressed concern that his pelvic condition required further treatment. R. at 1753. One physician suspected a continuing disease process because he had been unable to insert a probe "into the subcutaneous tissue." *Id.* The other physician suspected that Mr. Huerta had osteomyelitis but was hesitant to diagnose the disorder because osteomyelitis is uncommon in "flat bones" such as the pelvis, and because the initial x-rays did not clearly reveal osteomyelitis in Mr. Huerta's pelvis. R. at 1756. Though further therapy was recommended, the record for 20 years after the private physicians' recommendation is silent for any treatment for or complaints of symptoms relating to the left pelvis.

Mr. Huerta sought disability compensation, and in August 2016 VA provided him with a medical examination. The VA examiner opined that Mr. Huerta did not have an osteomyelitis infection after his 1989 accident and stated that physical examination revealed no signs attributable to osteomyelitis. R. at 1631.

---

[1] *Flap Surgery*, STANFORD HEALTHCARE, https://stanfordhealthcare.org/medical-treatments/p/plastic-surgery/procedures/flap.html (last visited Apr. 20, 2021).

Shortly thereafter, Mr. Huerta submitted an "Osteomyelitis Disability Benefits Questionnaire" from Dr. William Beauchamp, his treating orthopedic surgeon. Dr. Beauchamp stated that a recent MRI showed "foreign bodies in the superficial soft tissues . . . at or near the site of the 1985 iliac bone graft" and those foreign bodies caused Mr. Huerta's chronic osteomyelitis. R. at 1495, 617. His symptoms were noted to include constant deep pain in his low back and left hip, occasional edema and warmth at the site, fatigue, debility, visibly significant muscle atrophy, and neuropathic pain. R. at 1484-85. Dr. Beauchamp opined that Mr. Huerta's osteomyelitis was "[c]hronic, recurrent, [and] refractory to medical and surgical treatment." R. at 1482.

VA obtained an addendum medical opinion in 2017. The examiner reviewed all new records and concluded that Mr. Huerta did not have current active osteomyelitis and Dr. Beauchamp's diagnosis of chronic osteomyelitis was incorrect. The VA examiner stated that because the veteran's condition was last symptomatic in 1992, his chronic osteomyelitis was "inactive," and that the episodes in 1993 and 1994 were not related to osteomyelitis.

In a 2017 supplemental opinion, Dr. Beauchamp reiterated that Mr. Huerta had chronic osteomyelitis with a "long history of intractability and debility" that was likely related to the multiple infections he experienced between 1989 and 1994. R. at 617-18. Dr. Beauchamp stated that the episodes in the 1980s and 1990s were not treated correctly, because the treatment never (but should have) included "debridement of infected or necrotic tissues and a long course, at least six weeks, of parenteral antimicrobial therapy, directed at the causative pathogens." R. at 617. Dr. Beauchamp explained that, even with proper treatment, osteomyelitis is "severe, persistent, and often incapacitating," and "chronic osteomyelitis in adults is more refractory to therapy," i.e., difficult to manage. *Id.* The regional office subsequently granted Mr. Huerta service connection for osteomyelitis and assigned a 10% disability rating.

In its March 2019 decision, the Board assigned initial staged ratings dating back to 1986. The Board concluded that a 100% rating was warranted from November 8, 1986, to February 1, 1992, because the veteran had active pelvic osteomyelitis. For the next stage—February 1, 1992, to June 3, 1994—the Board concluded that a 20% rating was warranted because the veteran had had an active infection within the previous 5 years. And for the most recent stage—February 1, 1997 to March 2019—the Board assigned a 10% rating because, per the VA examiner, Mr. Huerta has not had an active infection since the 1990s.

The Board denied entitlement to a 100% rating for the entire period, finding it "unreasonable to assume that an automatic 100[%] disability rating is warranted for osteomyelitis, which initially manifests in the 'pelvis, vertebrae' or 'extends into major joints,' but which is later resolved without residual symptoms." R. at 18. The Board further reasoned that the "note to [DC 5000] states that a rating for osteomyelitis will not be applied following cure by removal or radical resection of the affected bone" and that the VA examiners said Mr. Huerta's osteomyelitis resolved in 1992 without any further residuals. *Id.* This appeal followed.

## II. ANALYSIS

"The Court reviews the interpretation of regulations de novo because interpreting a regulation is a purely legal question." *Langdon v. Wilkie*, 312 Vet.App. 291, 296 (2020). Such an interpretation begins with the text of the regulation, "the plain meaning of which is derived from its text and its structure." *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015). "To interpret a regulation we must look at its plain language and consider the terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997). "If the plain meaning is clear from its text and structure, then that meaning controls and that is the end of the matter." *Atencio v. O'Rourke*, 30 Vet.App. 74, 82 (2018). When assessing the meaning of a regulation, words should not be read in isolation but rather in the context of the regulatory structure and scheme. *Id.*

Interpreting the plain meaning of a regulation requires the Court to "bring all its interpretative tools to bear" and to "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2423-24 (2019). A regulation could be genuinely ambiguous to the extent it may not directly address an issue, or it may prove susceptible to more than one reasonable reading when applied to some fact patterns. *Id.* at 2410. But a regulation is not ambiguous simply because both parties insist that the plain meaning supports his or her position and neither party's interpretation is unreasonable to the Court. *Id.* at 2423.

We start with the text of DC 5000, which compensates for osteomyelitis that is acute ("having a short and relatively severe course"),[2] chronic ("persisting over a long period of time"),[3] or subacute ("somewhat acute; between acute and chronic").[4] Five disability ratings are available under DC 5000: 100%, 60%, 30%, 20%, and 10%. And for each of the five ratings, DC 5000 provides the following rating criteria for "[o]steomyelitis, acute, subacute, and chronic,":

> 100%: "Of the pelvis, vertebrae, or extending into major joints, or with multiple localization or with long history of intractability *and* debility, anemia, amyloid liver changes, *or* other continuous constitutional symptoms."
>
> 60%: "Frequent episodes, with constitutional symptoms."
>
> 30%: "With definite involucrum or sequestrum, with or without discharging sinus."
>
> 20%: "With discharging sinus or other evidence of active infection within the past 5 years."
>
> 10%: "Inactive, following repeated episodes, without evidence of active infection in the past 5 years."

38 C.F.R. § 4.71a (emphasis added).

Both Mr. Huerta and the Secretary recognize that the criteria for a 100% rating comprise five groups of symptoms; the parties disagree, however, about the exact nature of the groups and whether each group provides an independent means for establishing the 100% rating. Under Mr. Huerta's reading—which is based on the DC's use of the disjunctive "or" and the use of commas to separate each of the five groups—there are five discrete manifestations of osteomyelitis capable of satisfying the 100% rating: (1) Of the pelvis; (2) of the vertebrae; (3) extending into the major joints; (4) with multiple localization; or (5) with long history of intractability and debility, anemia, amyloid liver changes, or other continuous constitutional symptoms. Mr. Huerta argues that reading the five groupings differently would render any reference to the specifically identified osteomyelitis conditions in the 100% rating as meaningless or mere surplusage.

The Secretary focuses primarily on the overall structure of DC 5000, contending that it employs a "graduated" scheme whereby osteomyelitis is rated based upon active or inactive status. Secretary's Brief at 16. Under this reading, all inactive cases are funneled into either the 10% or 20% rating criteria, with the difference between the 10% and 20% criteria hinging on how long it

---

[2] *Acute*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 24 (32d ed. 2012).

[3] *Chronic*, *id.* at 359.

[4] *Subacute*, *id.* at 1789.

has been since the veteran last exhibited evidence of infection. As to the 100% rating, the Secretary also recognizes five types of osteomyelitis capable of satisfying the rating, but the Secretary defines the five types as follows: (1) Of the pelvis; (2) of the vertebrae; (3) extending into major joints; (4) with multiple localization; or (5) with long history of intractability. And the Secretary reads the language "and debility, anemia, amyloid liver changes, or other continuous constitutional symptoms" not as part of the fifth symptom group, but rather as language that modifies each of the five symptom groups. The Secretary thus reads the conjunctive "and" linking "intractability" and "debility" as signifying that each of the five previously mentioned groups must be accompanied by "debility, anemia, amyloid liver changes, or other continuous constitutional symptoms." Oral Argument (OA) at 26:00-:23, *Huerta v. Wilkie*, U.S. Vet. App. No 19-2805 (oral argument held Aug. 20, 2020), http://www.uscourts.cavc.gov/oral_arguments_audio.php. Under this interpretation, a veteran must show symptoms that are akin to an infection *in addition* to a diagnosis fitting within one of the five groups, such as osteomyelitis "of the pelvis."

Focusing on the 100% rating criteria at issue here, we note that the text and structure support Mr. Huerta's reading, whereby each of the five symptom groups represent alternative symptom groups capable of satisfying the rating. Specifically, the use of offsetting commas and the lack of a conjunctive term linking "of the pelvis" and " vertebrae," indicates a clear break between these symptoms. The comma alone that separates them strongly suggests that "of the pelvis" and "vertebrae" are independent entities rather than as part of a collective. Likewise, the use of the disjunctive "or" to separate the final three groups shows that they are intended to be viewed separately. It is a familiar canon of statutory construction that terms connected by a disjunctive "are to be given separate meanings," *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014). Although this canon is not absolute, nothing in the overall text or structure of DC 5000 signals that the phrase "and debility … or other continuous symptoms" serves to modify *all* of the preceding language in the 100% rating.

Further, the lack of punctuation between "intractability and debility" serves as a strong counterpoint to the Secretary's argument regarding the plain language of the 100% rating. Absent punctuation, nothing in the text or its structure links the phrase with the individual symptom groups preceding it—especially when those groups have been set apart from "intractability and debility" by disjunctive language, that is, by "or." In other words, the Secretary's argument would have more resonance if there were some punctuation before the "and debility" to establish a marker between

the previous disjunctive criteria, that is, five symptom groups beginning with "[o]f the pelvis" and ending with "long history of intractability"—which are clearly intended to be read as five separate elements—and a conjunctive phrase purporting to modify all the previous language.

Additional support for the veteran's interpretation is the conspicuous absence of any reference to active infection in the 100% criteria. This absence is especially noteworthy when one compares DC 5000 to its neighboring DCs, 5001 and 5002. For example, DC 5001 rates tuberculosis of bones and joints based on whether the tuberculosis is "active" or "inactive." 38 C.F.R. §§ 4.71a. Similarly, DC 5002 bases the ratings for multi-joint arthritis (except post-traumatic arthritis) on whether the arthritis is "an active process" or whether the veteran presents "chronic residuals." *Id.* These neighboring DCs show rating criteria that expressly distinguish between active and inactive disease processes, not requiring adjudicators to read between the lines or impose criteria not expressly required by the DC. If VA intended DC 5000 to distinguish between active and inactive disease process, VA knew how to write the provision to do so. *See Emerson v. McDonald*, 28 Vet.App. 200, 209 (2016).

The Secretary's proposed interpretation of DC 5000 is less convincing. The structure of DC 5000 yields no conclusive markers to show how the rating criteria for the various disability ratings stand in relation with each other. The Secretary posits that DC 5000 bears a "graduated" structure and so functions similarly to a "successive" rating, whereby the criteria for each rating are cumulative, incorporating the criteria of each lower rating. *See Middleton v. Shinseki*, 727 F.3d 1172, 1178 (Fed. Cir. 2013). In successive ratings, the evaluation of each higher rating includes the criteria of each lower such that "if a component is not met at any one level, the veteran could only be rated at the level that did not require the missing component." *Tatum v. Shinseki*, 23 Vet.App. 152, 156 (2009).

The difficulty with this line of reasoning is that DC 5000 bears no indication of a successive or cumulative in nature, which it would have to have for the Secretary's interpretation to hold. It's not precisely clear what the Secretary means by "graduated," but the word suggests a structure in which higher ratings incorporate the criteria of lower ratings without formally requiring that to justify a higher rating a veteran must establish each criterion for lower ratings. However, DC 5000 includes no implied elements, and thus the Secretary's graduated-structure argument is critically flawed. DC 5000 would have to be successive in express terms for the requirement of active infection within a given period to apply beyond the 20% rating. Short of this, it's not clear how DC

7

5000 differs from any other DC where a veteran must do no more than present a disability picture that most nearly approximates a specific rating, even where a disability might not manifest all the criteria in that rating. *See id.* at 155-57.

Ultimately, the Court finds the plain language for assigning a 100% disability rating under DC 5000 clear and unambiguous. Specifically, the plain language of DC 5000 establishes a diagnosis of chronic osteomyelitis of the pelvis as a sufficient basis to warrant a 100% rating. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). This observation applies no less to administrative agencies and their regulations. To the extent that VA has fallen victim to its own inartful drafting, VA also has the wherewithal to revise the DC.

Based on this interpretation, the Court concludes that the Board committed legal error in determining that Mr. Huerta's chronic pelvic osteomyelitis did not entitle him to a 100% disability rating. In light of this outcome, the Court need not address the adequacy of the four contested VA and private medical opinions.

### III. CONCLUSION

The Court REVERSES the Board's determination that a 100% disability rating under DC 5000 is not warranted for the entire period on appeal, VACATES that portion of the March 18, 2019, decision, and REMANDS the matter for further proceedings consistent with this opinion.

TOTH, *Judge*, dissenting: Although there is much to commend in the panel's plain text reading of the 100% criteria, I can't shake the conclusion that this reading doesn't fully account for the rest of the story: that virtually everything else in DC 5000 supports the requirement of an active disease process for the 100% criteria. As with all regulations, diagnostic codes should be read in their entirety and with an eye towards their text and structure. *Vazquez-Claudio v. Shinseki*, 713 F.3d 112, 115 (Fed. Cir. 2013). And try as I may, I can't read DC 5000 as requiring a total rating based solely on a historic diagnosis of pelvic osteomyelitis without any present symptoms or functional impairments. This doesn't square with the basic principle in veterans law that higher ratings correspond to greater disability.

In simple fact, what makes this case so difficult is that DC 5000 is ambiguous—perhaps even wildly so. It is ambiguous because it implies rather than expresses the same active-inactive

scheme throughout the ratings. To that end, the 10% and 20% rating criteria show a clear intent to capture *all inactive cases*, with the main difference between the 10% and 20% ratings hinging on whether it has been five or fewer years since the veteran experienced an active episode. That is simple enough, and from this a reader could naturally infer that an active infection is required to obtain a rating higher than 20%. However, the 30% rating complicates this dichotomy because it addresses permanent symptoms (involucrum or sequestrum) involving bone loss that don't chart neatly on either side of the active-inactive divide. For its part, the 60% rating—with its reference to "frequent episodes" and "constitutional symptoms"—clearly compensates active osteomyelitis. So, although the plain text of the 100% criteria doesn't expressly require an active process of osteomyelitis of the pelvis, the plain text strongly implies that without present symptoms or functional impairments, a historic pelvic osteomyelitis diagnosis does not warrant a total rating.

For this reason, though I agree with how the panel reads the text of the 100% criteria, I nonetheless regard the Secretary's reading as a more persuasive account of how DC 5000 is intended to operate as a whole—specifically, that an active process of some kind is required for a 100% rating. This prevents the curious (if not absurd) result we arrive at here, where a symptomless veteran obtains a 100% rating in perpetuity merely on a diagnosis of chronic osteomyelitis of the pelvis, while a veteran with frequent episodes of infection in a different body part featuring constitutional symptoms may receive only a 60% rating. (Constitutional symptoms refer to body-wide, systemic effects of the disease. *See* STEDMAN'S MEDICAL DICTIONARY 1743 (27th ed. 2000).) DC 5000 must be understood to operate the same way other DCs do: "as the ratings increase from 10 to 100 percent, the associated symptoms become noticeably more severe." *Vazquez-Claudio*, 713 F.3d at 116. Because the Secretary's reading comports with this principle and can be reconciled with the 100% criteria, I find this a persuasive interpretation. For this reason, I would hold that an active process is required to obtain a total rating.

Two final matters. First, because the majority did not need to reach them, I offer no opinion on the merits of Mr. Huerta's other arguments for relief. Second, to the extent the Secretary disagrees with the Court's reading of DC 5000, it is completely within his power to revise and clarify the regulation, which seems to have remained unchanged in any respect since at least 1964, when it first appeared in the Code of Federal Regulations.

For the reasons given above, I respectfully dissent.